# GUSTAVIA NIHISER

## *vs.*

# WINTON M. NIHISER.

*Husband and wife: creditor relation; property purchased with
wife's money; no promise of repayment; mortgage of
property to secure debt of wife; repayment;
Principal and surety.*

If, with the knowledge and acquiescence of the wife, her
money is used to purchase property and the title thereto is
taken in the name of the husband, she can not claim as cred-
itor of the husband, in the absence of an express promise of
the husband at the time to repay to her.         pp. 455-456

When property is pledged or mortgaged by the owner to
secure the debt of another person, such property occupies the
position of a surety.                               p. 459

The implied obligation of the principal to indemnify his
surety springs up at the time the relation is entered into, and
is consummated when the surety has paid the debt, but the
principal can show that he has reimbursed his surety.   p. 459

Evidence is always admissible to show the equitable rights of
the principal and surety toward each other, if material to the
right to recover the amount paid by the surety; and as between
the immediate parties, to show their true relation in fact,
although different from that indicated by the instrument or
their relative positions thereon.                     p. 459

A wife, a beneficiary of a trust estate, permitted her hus-
band to receive her income from her trustee, which was used
to purchase real estate the title to which was taken in the hus-
band's name; subsequently money was borrowed by the wife
from her trust estate, the loan being secured by a mortgage on
the property, the husband continuing to receive the wife's in-
come. Upon a foreclosure of the mortgage, the excess was
claimed by the wife, holding a judgment against the husband,

and by the husband, alleging that the debt secured by the mortgage was the sole and separate debt of the wife, and that the property mortgaged was security only:

*Held*: that if the husband, while receiving the wife's income, proposed to treat the wife as his debtor, the circumstances demanded that he apply the income to the debt, or tell the wife he proposed to assert the rights of a surety if his property was sold.                                                   p. 460

*Held*: that a court of equity, in the absence of clear and satisfactory proof, that the wife did not intend her income to be applied to the payment of the debt, will not permit a husband, as surety, to hold the wife responsible, as principal; but will be regarded as reimbursed where after the creation of the relation of principal and surety, the husband receives more of her money than that for which he became surety.            p. 461

*Decided January 13th, 1916.*

Appeal from the Circuit Court for Washington County. In Equity. (KEEDY, J.)

The cause was argued before BOYD, C. J., BRISCOE, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Louis J. Burger* and *John Hinkley* (with whom was *Albert J. Long* on the brief), for the appellant.

*Harry Brindle* (with whom was *Frank G. Wagaman* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a decretal order of the lower Court, which sustained exceptions filed by the appellee to the distribution in an auditor's account of $721.40 to the appellant, who was a judgment creditor of the appellee, and which decreed that the appellant was indebted to the appellee in a sum equal at least to the judgment, interest and costs. They were husband and wife until 1912, when they were divorced.

They moved from West Virginia to Keedysville, Washington County, Md., in 1887, where the appellee practised medicine. On March 24, 1887, a property situated in Keedysville was conveyed to the appellee for the consideration, as mentioned in the deed, of $3,000. At that time Mr. John T. Morris was trustee of an estate, the income of which was payable to Mrs. Nihiser for life and the remainder was left to her children. The income seems to have amounted to about $1,500 per annum. An agreement of counsel shows that on the date of the deed a mortgage was given for $3,000, to secure the payment of five promissory notes of $600 each, payable in one, two, three, four and five years. The appellant claims, and is apparently sustained, that the notes were paid with the income received from the trustee. At any rate the evidence shows that all of the income, with the exception of several sums, was paid to Dr. Nihiser from 1887 to 1901. On October 8, 1887, Mrs. Nihiser wrote to Mr. Morris as follows: "We received by B. & O. express $171.00, amount of collections due me October 1, 1887. Will you please send checks to Dr. hereafter instead of the money, as we have opened an account with the First National Bank of Hagerstown." Although the evidence shows that Mrs. Nihiser's income was used in paying for the Keedysville property, it likewise appears that it was done with her entire consent and acquiescence, and there is nothing to show that at the times of the payments to Dr. Nihiser there was a promise on his part to repay the amounts so received.

In 1894 they moved to Baltimore but returned to Keedysville in the Spring of 1895. Mrs. Nihiser and apparently her two children, who were then seven and nine years of age respectively, greatly preferred living in Baltimore, but the Doctor was not satisfied there and they returned to Keedysville. It is claimed by the appellant that in order to satisfy her and the children in leaving Baltimore, her husband promised to build a house for her on some lots in Mountain Lake Park, Md., which she had agreed to purchase, by an agreement dated September 3, 1894. The consideration for the

lots mentioned in the agreement was $600.00—$100.00 of which was paid in cash, and the remainder was to be paid in two payments of $250.00 each, on January 1st, 1895, and January 1st, 1896. The deed for the Mountain Lake Park lots was not made until November, 1903, when the lots were conveyed to Mrs. Nihiser, but in 1895, a house was erected on them. On April 2nd, 1895, Dr. and Mrs. Nihiser executed a mortgage on the Keedysville property, which stood in his name, to John T. Morris for $2,500.00, which recited that Mr. Morris had by an order dated February 25th, 1887, been appointed trustee for the property and estate devised and bequeathed by Theodore Weems "for the sole and separate use of said Gustavia Nihiser (formerly Gustavia Weems) and Rachel Weems," that by another order passed on the 27th of March, 1895, "the said Trustee was authorized to loan and advance to said Gustavia Nihiser from the trust estate held by him for her in said cause, the sum of Twenty-five Hundred Dollars, the said loan to be for five years with privilege of renewal in the discretion of said trustee, and to be secured by a mortgage to said trustee on the hereinafter described property from the said Gustavia Nihiser and her husband, Winton M. Nihiser," and that in execution of said last mentioned order "the said John T. Morris, Trustee as aforesaid, hath loaned and advanced to the said Gustavia Nihiser the sum of twenty-five hundred dollars, being part of the trust estate aforesaid held by him for her as aforesaid, *the said loan to be returned at the end of five years from the date hereof,* and to be secured by a mortgage of the hereinafter described property in accordance with the terms of said order."

The mortgage contains the usual covenants on the part of Dr. and Mrs. Nihiser and provides that in case of default and a sale made under the power, the surplus, if any, after payment of expenses, incident to the sale and all claims of the trustee under the mortgage, shall be paid to "the said mortgagor, Winton M. Nihiser." No part of the mortgage was paid, and Louis J. Burger, who had been appointed substi-

tuted trustee after the death of Mr. Morris, sold the property under the power of sale for $3,475.50. After distributing to the costs, including commissions, and the principal of the mortgage, the auditor distributed to Mrs. Nihiser, in part payment of the judgment held by her, the sum of $721.40. That was a judgment obtained by her against Dr. Nihiser for $1,564.19, with interest and costs, on June 4, 1912, which was after they were divorced, on a note given by him to her sometime prior thereto. It was for insurance money she had received, and which her husband had borrowed from her. She filed a petition in the mortgage case asking to have the surplus above the mortgage distributed to her judgment, and the Court passed an order directing the auditor to so distribute said surplus, subject to all legal exceptions. The appellee filed exceptions to the audit, alleging that the debt secured by the promissory note and mortgage to the trustee was the sole and separate debt of Mrs. Nihiser, and that he signed and executed them solely as surety, that the property described in the mortgage and sold in those proceedings was at the time of the sale his sole property and that by reason of the facts stated Mrs. Nihiser was indebted to him in the sum of $2,500.00, together with the costs and expenses incident to the sale. He then claimed that he was entitled to set off that sum against the judgment. Neither trustee collected any interest on the mortgage, and there seems to have been no claim for interest, either after the separation of the parties in 1909 or after the divorce

The law in this State is too clear to admit of any question "that the wife may become a creditor of the husband, in respect of money or property belonging to her as her separate estate, which the husband has *received under an express promise at the time of repaying to her.* But if such money or other separate property of the wife has been received by the husband, with the knowledge and acquiescence of the wife, without such express promise *at the time,* no implied assumpsit, either legal or equitable, will arise to support a

claim against the husband or his estate. The wife having the *jus disponendi* of her separate property, if she thinks proper to let her husband have it, or appropriate it, without any express promise or agreement at the time to account for or repay her the amount so received or appropriated, she can not afterwards set up a claim against the husband upon the footing of a creditor. In such case she is taken to have acquiesced in the appropriation of the fund for the common benefit of herself and husband, or for the benefit of the family." *Grover & Baker Sewing Machine Co.* v. *Radcliff,* 63 Md. 496. See also *Farmers and Merchants Bank* v. *Jenkins,* 65 Md. 245; *Taylor* v. *Brown,* 65 Md. 366; *Jenkins* v. *Middleton,* 68 Md. 540; *Stockslager* v. *Mech. Loan Inst.,* 87 Md. 232; *Downs* v. *Miller,* 95 Md. 602, and cases there cited in them. In *Reed* v. *Reed,* 109 Md. 690, it was held that when a wife purchases property with her money and causes it to be conveyed to herself and husband as tenants by the entireties, the effect of a subsequent decree of divorce is to convert it into a tenancy in common, and it does not entitle her to claim the entire ownership. In that opinion *Tyson* v. *Tyson,* 54 Md. 35, was referred to. There the wife who had obtained a divorce *a mensa et thoro* sought to have the Court restore to her her separate estate, which her husband had received, but after referring to some of the earlier cases in this State, which were followed in those cited above, the Court said: "If the effect of knowledge and acquiescence on the part of the wife was sufficient to destroy her right as creditor in this case, unless there was an agreement or promise of the husband to repay, it follows, necessarily, that the conversion of the money by the husband, with the wife's concurrence, and her conjoint act and deed must equally destroy her right to recover it as her separate property, after divorce, after the lapse of a series of years, without any promise or agreement of the husband to return or repay it."

It would seem, therefore, to be clear, under the authorities cited and the evidence, that the appellant can not now claim

that the Keedysville property was hers, and the appellee
could not be denied the right to assert the claim made by him,
merely because the money with which that property was pur-
chased was originally that of Mrs. Nihiser. The evidence is
conclusive that it was used with her consent and acquiescence
and that the husband did not *at the time* promise to repay it.
Moreover, the petition of the appellant expressly alleges that
Winton M. Nihiser was the owner of the equity of redemp-
tion in the real estate sold, that her judgment was the next
lien to the mortgage and prayed that the surplus be applied
to the payment of the judgment. There is no other prayer
in the petition and the appellant's claim against this fund
therein is based entirely on her judgment. The mortgage
itself, to which the appellant was a party, also provides as
we have seen, that in the event of a sale under the power,
the surplus, if any, should be paid to Winton M. Nihiser.
There can, then, be no doubt that the Keedysville property
belonged to him, and any right the appellant has to the sur-
plus must be founded on her judgment.

Coming then to the Mountain Lake Park property, the
question is whether the appellee can defeat the distribution
to the appellant of the surplus on the ground that *his* prop-
erty was sold to pay *her* debt, and that he was merely surety
for her. The recitals in the mortgage do undoubtedly show
that the loan was to Mrs. Nihiser. The order of the Court
authorized the trustee "to loan and advance to said Gustavia
Nihiser from the trust estate held by him for her in said
cause, the sum of twenty-five hundred dollars," and the mort-
gage recited that the trustee had, in execution of that order,
"loaned and advanced" to her that sum. Notwithstanding
those recitals we are of the opinion that the letter of John T.
Morris to Dr. Nihiser, dated in March, 1895, in reference
to the decree of the Court authorizing the loan, and some
of the other evidence ruled out were admissible, but giving
due weight to said testimony, as if it had been admitted,
it does not materially affect the question. The house was

built for Mrs. Nihiser with her money on land which she then had an equitable interest in and subsequently had a deed for.

But conceding all that to be true, the question still is whether he is in a position to assert in a Court of Equity a claim for the amount of the mortgage against his wife. There can be no doubt that he can not for at least a part of it— such part as he used for his own purposes. The learned Judge below concluded that he had paid at least two thousand dollars of the amount for his wife, and as that was more than the judgment he did not deem it material that some of the money obtained on the mortgage did not go into the Mt. Lake Park property. While we think it was incumbent on Dr. Nihiser to prove how much of the sum received from the mortgage he paid out on account of the Mt. Lake Park property, and we are not prepared to say that the evidence shows that the $300.00 which the lower Court included in the $2,000.00 was paid out of that fund, it does appear that the sum of $1,415.00 was paid to the contractor, who built the house, and several hundred dollars were invested in furniture for it, and hence we will assume that an amount equal to the judgment was paid by him out of the $2,500.00.

As no question has been raised by the appellant with reference to the decision of the Court below, that the Act of 1914, Chapter 393, now section 12 of Article 75 of the Code, and such cases as *Smith* v. *Wash. Gas Light Co.,* 31 Md. 12, authorized the Court to entertain the claim of the appellee asked to be set off against the judgment, we will not discuss that; but, assuming the conclusion of that Court to be correct on that subject, we will determine the main question, whether the appellant is indebted to the appellee by reason of the sale of the Keedysville property sold under the mortgage. The theory of the appellee is that the relation of principal and surety existed between Dr. and Mrs. Nihiser for so much of the money secured by the mortgage as was used for her. The general rule is that "When property of any

kind is pledged or mortgaged by the owner to secure the debt, default or miscarriage of another person such property occupies the position of a surety." 27 *Am. & Eng. Ency. of Law,* 433. The implied obligation of the principal to indemnify his surety springs up at the time the relation is entered into and is consummated when the surety has paid the debt, *Nally* v. *Long,* 56 Md. 567, and, of course, when the property is sold to pay the debt and the debt is thereby paid. But, "The principal can show in his defense that he already has reimbursed his surety," 32 *Cyc.* 269, and "The burden is upon the surety to show the relation, in an action in which his right to a particular recovery depends upon his relation as surety to another as principal. * * * Evidence is always admissible to show the equitable rights of the principal and surety toward each other, and which is material to the right to recover the amount alleged to have been paid by plaintiff as surety, and as between the immediate parties, to show their true relation in fact, although different from that indicated by the instrument or their relative positions thereon." 32 *Cyc.* 269 and 270.

Keeping those familiar principles in mind, it seems to us that the established facts preclude a recovery by the appellee, and prevent his setting off this claim against the appellant's judgment. Admitting the payments to the appellee of the income of the appellant to have been so made as to conclude any question about his ownership of the Keedysville property, and admitting that the mortgage was for the most part the sole debt of the appellant, which mortgage he joined in and placed upon his property in order to secure the debt, we are not prepared to say that under the circumstances he can now hold the appellant for the amount of the mortgage applied to the Mountain Lake Park property. From April 2nd, 1895, when the mortgage was given, until some time in 1901, he collected practically all of the income of the appellant, as indeed he had been doing for eight years prior to the date of the mortgage. By reason of the exclu-

sion of some of the evidence offered, it is not definitely shown
what the income amounted to, but from what we can gather
from the record, and as stated in the opinion of the lower
Court, it was about $1,500.00 per annum. After the mort-
gage was given, the appellee thus received eight or nine thou-
sand dollars of the appellant's money. The mortgage and
note were payable five years after date and at the end of
that time the trustee could, and under some circumstances
it would have been his duty to demand the payment of the
mortgage in order to protect the remaindermen. It is said
that the mortgage could not have been paid during the first
five years because it was not payable until the end of that
period, but inasmuch as no interest was being paid, it can
not be doubted that the trustee would have accepted pay-
ments during the five years, and even if there could be any
question about that, the appellee knew it would mature April
2nd, 1900, and if he proposed to treat his wife as his debtor,
the circumstances demanded of him that he should at least
apply what he did receive after the maturity of the mort-
gage, or at least tell her that he proposed to assert the rights
of a surety, if his property was ever sold under the mort-
gage. If that was the only reason for not paying it, he
could have saved some of the income for the year 1899,
which, added to that of 1900, would have enabled him to pay
at least what he secured for her. Moreover, if he had then
shown any inclination to apply the money to the payment of
the mortgage, there is nothing to suggest that she would not
have permitted him to still collect her income until it was
paid. They did not separate until eight years after she
stopped him from collecting it. She was disabling herself
from paying the mortgage by giving all of her income to him,
and he was presumably acting for her interest. She and her
two children testified that she was constantly urging him to
pay the mortgage off, but he did not pay one dollar of it—
notwithstanding his receipt, after it was given, of so much
of his wife's money. It is true she could have stopped the

payments to him sooner, as she subsequently did in 1901, but that can not affect the question, for she may not only have been influenced by what most wives would be—a desire to avoid disagreeable consequences from asserting their rights against their husbands—but she actually let him have eight or nine thousand dollars of her money after the mortgage was given. If, then, she had or is presumed to have had knowledge of the fact that he had become surety for her, and hence was her creditor, entitled to proceed against her if his property suffered, is not her defense ample and clear, to follow the language quoted above, as she "already has reimbursed her surety"? 32 *Cyc.* 269, *supra.*

Upon what principle can it be said that the wife cannot become a creditor of her husband for her money which he has received with her consent and acquiescence, unless he at the time promises to repay it; but he can hold her responsible as her surety and is not to be regarded as reimbursed, although after the execution of the instrument which he claims created the relation of principal and surety he received more than three times as much of her money as he became surety for? A court of equity should not permit such an injustice to be done, at least unless there is clear and satisfactory proof that the wife did not intend any of the money to be applied to the payment of the mortgage or other instrument by which the husband became liable to the creditor. It is not necessary to determine how far the recent legislation in this State, beginning with the Act of 1898 and now in Article 45 of the Code, has affected the rule originally announced when the property rights of married women were very limited, but we do not hesitate to hold that a husband who has thus received sufficient of his wife's money to pay off the indebtedness for which he has become surety must be regarded as reimbursed. We mean, of course, when, as in this case, he was not required by his wife to apply it to other purposes and it was simply given to him without any specific directions as to what he was to do with it, which the appel-

lee claims was the case here.  The appellant claims that she insisted upon his paying the mortgage off with this money, and of course if she is correct that is all the more reason for regarding the appellee as reimbursed.

But the evidence of Mrs. Nihiser and of her two children satisfies us that Dr. Nihiser promised to pay off the mortgage with the money thereafter received by him and, although he denies it, we think the circumstances corroborate them.  It is difficult to understand how any man could receive $1,500.00 a year of his wife's money for eight years and still intend to hold her responsible for something less than $2,000.00 which she got the benefit of because property paid for with her money, but taken in his name, was used to secure the loan.  That of itself ought to be sufficient corroboration for her, but when he does not deny that he continued for six more years to receive $1,500.00 per annum of her money—especially as he swore he was making from $1,-200.00 to $3,500.00 a year in his practice—and she had no way of paying the mortgage off excepting with that money, her evidence is much more probable than his.  How could the mortgage be paid,. if he did not pay it, when he was getting all of her income?  It is true that the children who testified were very young when the mortgage was given, but they also testified to statements made at times when they were of such ages as there could be no excuse for false swearing by reason of their ages.  They were either telling the truth or they were deliberately falsifying, and we have no reason to find them guilty of perjuring themselves.  It becomes unnecessary to pass on the exceptions to testimony which are numerous.  It is of course understood that the rights of creditors of the husband are not involved.  We are of the opinion that the decretal order of the lower Court must be reversed and the audit should be ratified.

> *Decretal order reversed, and cause remanded so that an order can be passed in accordance with this opinion, the costs to be paid by the appellee.*